**Michael Patrick MURRAY, et al., Appellants,**

v.

**MOTOROLA, INC., et al., Appellees.**

Nos. 07–CV–1074, 07–CV–1075, 07–CV–1076, 07–CV–1077, 07–CV–1078, 07–CV–1079.

District of Columbia Court of Appeals.

Argued Jan. 23, 2009.

Decided Oct. 29, 2009.

As Amended on Rehearing Dec. 10, 2009.

Mayer Morganroth, with whom Jeffrey B. Morganroth and Joanne L. Suder were on the brief, for appellants.

Andrew G. McBride, Washington, with whom Joshua S. Turner was on the brief, for appellees Cellco Partnership d/b/a Verizon Wireless, Bell Atlantic Mobile, Inc., Verizon Wireless, Inc., Verizon Wireless Personal Communications LP f/k/a Primeco Personal Communications LP, Verizon Communications Inc., Vodafone Group Plc, Nokia Inc, and Western Wireless LLC. The following counsel were also on the brief: Jennifer G. Levy, Michael D. Jones, Garrett B. Johnson, Terrence J. Dee, and Michael B. Slade for appellee Motorola, Inc.; Jeffrey J. Lopez, Seamus C. Duffy, Susan M. Roach, and Maresa H. Torregrossa for appellees AT & T Corp., AT & T Wireless Services, Inc., Cingular Wireless LLC, BellSouth Cellular Corp., SBC Communications, Inc., SBC Wireless LLC, AB Cellular Holding, LLC, Dobson Communications Corp., and Dobson Operating Co., LLC; Thomas C. Watson and Curtis S. Renner for appellees Cingular Wireless, LLC, SBC Communications, Inc., SBC Wireless LLC, and AB Cellular Holding, LLC; John H. Beisner, Matthew Shors, David Mortlock, Jane Fugate Thorpe, Scott A. Elder, Paul F. Strain, and M. King Hill, III for appellees Cellco Partnership d/b/a Verizon Wireless, Bell Atlantic Mobile, Inc., Verizon Wireless, Inc., Verizon Wireless Personal Communications LP f/k/a Primeco Personal Communications LP, Verizon Communications Inc., and Vodafone Group Plc; Paul S. Schleifman, J. Stan Sexton and Michael D. Moeller for appellee Sprint Corporation; Marcus Eyth, Paul Vishny, and Paul E. Freehling for appellee Telecommunications Industry Assoc.; Mark H. Kolman, Deborah Goldstock Ringel, and Kenneth B. Trotter for appellee Audiovox Communications Corporation; Howard D. Scher, Cathleen Coyle McNulty, and John Korns for appellee Cellular One Group; Thomas R. Kline, L. Eden Burgess, and Charles Perry for appellee Western Wireless LLC; Robert B. Green for appellee Cellular Telecommunications and Internet Association; Steven M. Zager, Michele A. Roberts, Lance T. Lackey, and Ashley L. Rogers for appellee Nokia, Inc.; Dwight D. Murray and Francis A. Citera, for appellees Sony Electronics Inc. and Qualcomm Incorporated; Lauren S. Reeder, and Jameson B. Carroll for appellee American National Standards Institute; G. William Austin and Stephen E. Baskin for appellee BellSouth Corporation; Ralph A. Taylor, Jr. for appellee Institute of Electrical and Electronics Engineers, Incorporated; and Gare Smith, Sarah Altschuller, Joe Cyr, Scott Reynolds and Eric Statman for appellee Vodafone Group Plc sued as Vodafone Airtouch Plc.

Sarang Vijay Damle, United States Department of Justice, with whom Mark B. Stern, United States Department of Justice, Matthew B. Berry, General Counsel,

Federal Communications Commission, Jeffrey S. Bucholtz, Acting Assistant Attorney General at the time the brief was filed, and Jeffrey A. Taylor, United States Attorney at the time the brief was filed, were on the amici curiae brief, in support of appellees.

Before KRAMER, FISHER and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

This appeal presents the question of whether federal law preempts any or all of plaintiffs'/appellants' numerous causes of action for damages against a group of cellular-telephone manufacturers, distributors, promoters, sellers, service providers, industry associations, and standards-setting entities. The Superior Court ruled that all of the claims are barred on the basis of both express and implied federal preemption. For the reasons that follow, although we find no express preemption, we conclude that federal law does impliedly preempt plaintiffs' claims insofar as they seek to hold defendants liable for bodily injuries from cell phones that met the radio frequency ("RF") radiation standard adopted by the Federal Communications Commission (the "FCC"). At the same time, we conclude that insofar as plaintiffs' claims are premised on allegations that they were injured through use of cell phones that did not meet the FCC standard, the claims are not federally preempted. We also conclude that plaintiffs' claims alleging violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C.Code § 28–3904 (2001), may survive the preemption challenge. We therefore affirm in part and reverse in part the judgment of the Superior Court dismissing the complaints, and we remand for further proceedings consistent with this opinion.

## I.

■ Through six separate complaints filed in November 2001 or February 2002 ("the Complaints"), plaintiffs/appellants (hereinafter, "plaintiffs")[1] sued defendants/appellees (collectively, "Motorola et al.," "defendants," or the "cell-phone companies"), alleging that plaintiffs suffered illness and injury (including brain cancer or tumors), or loss of consortium, as a result of using hand-held cellular telephones produced, sold, or promoted by defendants (hereinafter "cell phones," "mobile phones," or "hand-held phones"). The Complaints assert virtually identical causes of action for (1) intentional fraud and misrepresentation; (2) negligent misrepresentation; (3) strict product liability; (4) failure to warn and defective manufacture and design; (5) negligence; (6) gross negligence; (7) breach of express warranty; (8) breach of implied warranty; (9) conspiracy; (10) violations of the CPPA[2]; (11) civil battery; and, except for the Schofield complaint, (12) loss of consortium. Motorola et al. thereafter attempted to remove the suits from the District of Columbia Superior Court, where they were

---

1. The plaintiffs/appellants are Michael Patrick Murray and Patricia Ann Murray; Richard Schwamb and Eret Schwamb; David C. Keller and Marsha L. Keller; Pamela A. Cochran and Gilbert Cochran; Baldassare S. Agro and Debrah A. Agro; and Dino E. Schofield.

2. See D.C.Code §§ 28–3904 and –3905 (2001). The Complaints refer to this statute as the "District of Columbia Consumer Protection Act of 2000," but the citations in the Complaints are to D.C.Code § 28–3904, a section of the CPPA that pre-dates 2000. The CPPA (specifically, D.C.Code § 28–3905(k)) was amended in 2000 to permit plaintiffs to sue in a representative capacity and to increase the amount of statutory damages available to a successful plaintiff. See 47 D.C.Reg. 6574, 6615 (Aug. 18, 2000).

filed, to the United States District Court for the District of Maryland. *See In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 327 F.Supp.2d 554 (D.Md.2004) (*"Wireless"*). The District Court (the Honorable Catherine Blake) found no basis for removal [3] and remanded to the Superior Court. *See id.* at 559, 571.

Upon remand to the Superior Court, defendants filed a motion to dismiss, arguing that, because plaintiffs' claims are preempted by federal law, plaintiffs had failed to state a claim upon which relief could be granted. The FCC participated as *amicus curiae*, likewise arguing that plaintiffs' claims must fail on preemption grounds. The Superior Court consolidated the six suits for purposes of oral argument. In a comprehensive August 24, 2007, memorandum opinion and order ("Order"), the motions judge, the Honorable Cheryl Long, dismissed the Complaints with prejudice, ruling that the claims set forth in them are precluded under the doctrines of express preemption, conflict preemption, and field preemption. Our review of the dismissals is *de novo. See Portuguese Am. Leadership Council of the U.S., Inc. v. Investors' Alert, Inc.*, 956 A.2d 671, 676 (D.C.2008).

## II.

We begin with a close look at the Complaints that commenced this litigation. Plaintiffs allege that Motorola et al. have long been aware of numerous studies revealing that the radio frequency emissions ("RF emissions" or "RF radiation") from cell phones have both thermal and non-thermal effects that are severely harmful to human health. For example, according to plaintiffs, the studies leave room for no dispute that the thermal effects of RF radiation can cause tissue destruction, a precursor to cancer. Deliberately suppressing such studies, plaintiffs allege, defendants "set about to co-op [sic] the federal agencies which had the jurisdiction to force the industry to prove the safety of cell phones." According to plaintiffs, the cell-phone companies ultimately succeeded in "manipulat[ing] the research" of the American National Standards Institutes ("ANSI") and in causing cell phones initially to be "excluded from any testing, compliance, or monitoring by any safety standard, government agency, or regulatory body." Eventually (in 1992), ANSI did recommend specific absorption rate [SAR] [4] limits applicable to cell phones, and, effective August 1, 1996, the FCC adopted a standard based in part on the

3. Among other theories, defendants asserted the theory of complete preemption to establish exclusive subject-matter jurisdiction in the federal forum. *See Wireless*, 327 F.Supp.2d at 562. As Judge Blake noted, complete preemption doctrine "allow[s] removal of a state claim when a federal statute wholly displaces the state-law cause of action"—*i.e.*, when a federal statute provides the "exclusive cause of action." *Id.* at 564 (internal quotation marks and citation omitted). Despite similarities in the names of the doctrines, complete preemption is "distinct from" federal preemption (such as "conflict preemption"), a point Judge Blake emphasized in her opinion. *Id.* at 564; *see also, e.g., Franciscan Skemp Healthcare, Inc. v. Central States Joint Bd. Health & Welfare Trust Fund,*

538 F.3d 594, 596 (7th Cir.2008) (explaining that complete preemption is "really a jurisdictional rather than a preemption doctrine" that applies where "federal law has effectively displaced any potential state-law claims," such that a claim, "even if pleaded in terms of state law, is in reality based on federal law") (citations omitted). Judge Blake's analysis of the "complete preemption" issue does not affect our analysis of the "federal preemption" issues raised by this appeal.

4. "SAR is a measure of the rate of energy absorption due to exposure to an RF transmitting source." *Wireless*, 327 F.Supp.2d at 559 n. 10 (citation omitted).

1992 ANSI recommendations.[5] But, plaintiffs complain, the FCC has "allowed cell phone manufacturers to self certify their cell phones as within the SAR limits" even though "SAR results can be easily manipulated." As a result, the Complaints continue, the SAR values that defendants report to the FCC during self-certification "are below actual values" and "actual values exceed the SAR limits established by the FCC."[6] The Complaints further allege that federally adopted SAR limits are inadequate in any case because they do not take into account " 'hot spots' [7] created by the convergence of airwaves."

Plaintiffs further charge that "[d]efendants were aware of numerous solutions that could virtually eliminate the health hazards of radiation from cell phones such as shielding, antenna phasing, use of low reluctance material pattern, shrouds, canting etc." The Complaints assert that, unwilling to sacrifice profits, defendants neither adopted these safety measures nor warned cell-phone users of potential risks or methods that could be used to minimize their exposure to radiation and to avoid injury. Instead, the Complaints allege, defendants led the public in general and plaintiffs in particular to believe that cell phones "do not pose any risk of harm to the user whatsoever" and that "there is absolutely no risk of harm associated with the use of cell phones."

■ Judge Long found that the gravamen of plaintiffs' Complaints is that the cell phones that defendants manufactured or promoted were unsafe because they emitted a dangerous level of RF radiation, notwithstanding any FCC approval of the phones. Through their strict-product-liability, breach-of-implied-warranty, negligence, and failure-to-warn/defective-manufacture-and-design counts, plaintiffs seek damages on the grounds that their cell phones were "defective" and "unreasonably dangerous" when they entered the market and that the phones "emit harmful radiation fields without adequate safeguards to protect the user," create a "risk of biological damage" and other "health risks" resulting from exposure to RF emissions, and do not include available exposure-reducing safeguards (*e.g.*, headsets and speaker-phone adaptors). Plaintiffs' intentional-fraud-and-misrepresentation, negligent-misrepresentation, and breach-

**5.** The standard that the FCC adopted was based in part on the 1992 recommendations of ANSI and the Institute of Electrical and Electronics Engineers, Inc. ("IEEE"), and in part on criteria published by the National Council on Radiation Protection and Measurements ("NCRP"). *See Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 12 F.C.C.R. 13494, 13496, ¶ 3 (1997). Previously, in 1985, the FCC had adopted the 1982 ANSI recommendations "as a processing guideline for human exposure to RF radiation." *Biological Effects of Radiofrequency Radiation*, 100 F.C.C.2d 543, 560 (1985). However, that regulatory action applied only to certain broadcast facilities, satellite-earth stations, and experimental facilities. *Id.* at 562.

**6.** Although the Complaints include such allegations, plaintiffs disclaim an intent to assert "fraud-on-the agency" claims. As defendants argue, it is likely in any event that such claims would be barred under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349, 353, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (relying on the "variety of enforcement options that allow [the federal agency] to make a measured response to suspected fraud upon the Agency" in holding that plaintiffs' fraud-on-the-agency suit was preempted).

**7.** According to the Complaints,

"[h]ot spots" are created by the convergence of airwaves by reason of reflection and refraction off of the irregular surfaces of the human head and attenuation by passage through different layers of skin, fat, bone, etc.... [H]ot spots are as much as 200 times higher tha[n] the RF radiation from the cell phone and results [sic] in harmful heating of the brain.

of-express-warranty claims seek damages on the grounds that defendants misrepresented that "cell phones are safe to use," that they failed to disclose that "there was a great risk of harm associated with the use of cell phones," and that cell phones "are not safe and have high potential for causing serious biological and health effects...." Through their civil-battery counts, plaintiffs seek damages for defendants' having "inflicted harmful or offensive contact" on plaintiffs by exposing them to "radiation fields which ... could cause ... significant health risks and effects."[8]

Finally, Count Nine of each Complaint raises CPPA claims. Plaintiffs essentially have quoted from each of the paragraphs of D.C.Code § 28-3904, going so far as to include claims that appear to be unsupported by any of the other factual allegations of the Complaints (such as claims that defendants "falsely state[d] the reasons for offering and/or supplying goods or services at sale or discount prices" in violation of section 28-3904(*l*), and misled plaintiffs "into believing deceptive representations or designations of geographic origin in connection with goods or services," in violation of section 28-3904(t)). But, more apropos of other allegations of the Complaints that Count Nine incorporates by reference, plaintiffs also allege that defendants falsely represented that their goods have "approval, certification [or] characteristics" that they did not have, in violation of sections 28-3904(a) and (b), and that defendants made false and misleading statements or omissions that had the "capacity, tendency or effect of deceiv-

ing or misleading consumers," in violation of D.C.Code §§ 28-3904(e) and (f).

With this reading of the Complaints in mind, we turn to the preemption issues.

### III.

The Supremacy Clause, Article VI of the United States Constitution, declares that "the Laws of the United States ... shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI., cl. 2. Courts have identified three ways in which, pursuant to the Supremacy Clause, federal law may preempt state law, either expressly or impliedly. *See In re Couse,* 850 A.2d 304, 308 (D.C.2004). There is express pre-emption "where statutory language 'reveals an explicit congressional intent to pre-empt state law'...." *Id.* (quoting *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)). Federal law supplants state law under the doctrine of "conflict preemption," the first type of implied preemption, where "compliance with both federal and state regulations is a physical impossibility, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objecti[ves] of Congress." *Id.* (citations omitted); *see also Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (clarifying that "both forms of conflicting state law are nullified by the Supremacy Clause") (citation and internal quotation marks omitted). Field preemption, the second type of implied preemp-

---

8. The Complaints also include separate counts for conspiracy and loss of consortium. Civil conspiracy, however, "is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Coulter v. Gerald Family Care, PC,* 964 A.2d 170, 187 (D.C.2009) (citation omitted). A loss-of-consortium claim, directed at providing relief to spouses and children of injured individuals, likewise is dependent on the success of the underlying claims for injury. *See Hill v. Medlantic Health Care Group,* 933 A.2d 314, 331 (D.C.2007).

tion, occurs when "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Couse*, 850 A.2d at 308 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).[9] For preemption purposes, federal "law" includes federal regulations, *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), and state "law" includes the common law as a basis for judgments in tort suits. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S.Ct. 999, 1008, 169 L.Ed.2d 892 (2008).[10]

## IV.

Two provisions of the federal Telecommunications Act of 1996 (the "Telecommunications Act"), Pub.L. No. 104–104, 110 Stat. 56 (1996), were the basis for the Superior Court's finding that the Complaints were barred on the basis of express preemption: 47 U.S.C. §§ 332(c)(7)(B)(iv) and 332(c)(3)(A).

### A. Section 332(c)(7)(B)(iv)

In relevant part, section 332(c)(7) provides:

(7) Preservation of local zoning authority.

(A) General authority. Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations.

. . .

(iv) *No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless services facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications] Commission's regulations concerning such emissions.*

47 U.S.C. § 332(c)(7)(B)(iv) (italics added). Interpreting the term "personal wireless service facilities" to include cellular telephones, Judge Long reasoned that, by prohibiting state regulation of personal wireless service facilities on the basis of RF emissions, section 332(c)(7)(B)(iv) pre-

---

9. These three forms of preemption are not "rigidly distinct" and may overlap at times. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 n. 6, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (citation omitted). For example, both "field" and "conflict" preemption are implied-preemption doctrines, but they are distinct insofar as the former involves preclusion of all state law in an area, and the latter precludes only those laws that "under the circumstances of a particular case, . . . stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373, 120 S.Ct. 2288 (brackets and citation omitted).

10. *Riegel* and its predecessors effectively foreclose plaintiffs' argument that a lawsuit for damages is immune from preemption altogether because it "do[es] not seek . . . to im-

pose new or different technical standards" and merely "seek[s] compensatory damages for . . . personal injuries." In *Riegel*, the Supreme Court held that, for purposes of preemption, state law includes state tort law whether applied in lawsuits for injunctive relief or damages. Quoting *Cipollone*, 505 U.S. at 521, 112 S.Ct. 2608, the Court explained that a tort "liability award can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Riegel*, 128 S.Ct. at 1008; *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 249, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (recognizing that "regulation can be as effectively asserted through an award of damages as through some form of preventive relief") (citation omitted).

cludes plaintiffs' state-law claims about cell phone RF radiation.

■ The statutory language provides some basis for Judge Long's interpretation of the term "personal wireless service facilities." The term is defined in section 332 as "facilities for the provision of personal wireless services," and "personal wireless services" in turn is defined to include "commercial mobile services." 47 U.S.C. § 332(c)(7)(C)(i)(ii). The FCC has explained that cellular telephones are a critical component of the personal-wireless-service network; for transmission to occur, base stations must send "low power RF signals" back and forth to transmitters that are "embedded in wireless telephones." In that sense, a cellular telephone can reasonably be said to be a "facility for the provision of wireless services" (inasmuch as the services exist only because individuals have cell phones).[11] *See* Webster's Third New International Dictionary 812 (3d ed.2002) (defining "facility" as "something that promotes the ease of any action, operation, transaction, or course of conduct"). And, notably, plaintiffs asserted in their Complaints that "the cell phone is not limited to the actual cellular wireless hand held telephone itself," but includes "base stations, antennas, land lines, and switching offices, all of which are necessary for the operation of a cell phone...." Not unreasonably, Judge Long ruled that "plaintiffs cannot be heard to deny that hand-held cellular phones are an integral part of the 'provision of personal wireless

services' regulated by the federal government."

Nevertheless, we think the foregoing interpretation does not adequately take into account the context and legislative history of the pertinent statutory language, which must inform our *de novo* review. As the excerpt from section 332(c)(7) quoted above shows, the section is entitled "Preservation of local zoning authority." Relying on *Pinney v. Nokia,* 402 F.3d 430, 454–55 (4th Cir.2005), plaintiffs argue that this caption makes clear that section 332(c)(7)'s reference to "facilities" is a reference to cell-phone towers, not a reference to cell phones, in that only the former are subject to zoning laws. This argument finds additional support in the repeated use of the word "construction" (or "construct") throughout section 332(c)(7), a term typically used in connection with fixed structures rather than portable devices. *See, e.g., Am. States Ins. Co. v. Edgerton,* No. CV 07–239–S–MHW, 2008 WL 4239000, at *7 (D.Idaho Sept.3, 2008) (noting that the word "construction ... refers to the building of a new structure or the functional equivalent"). Similarly, a reference in section 332(c)(7)(B)(ii) to "request[s] for authorization" to place modify, or construct "personal wireless service facilities" is most reasonably understood as a reference to procedures for developing real property rather than personal property.[12]

The legislative history of section 332(c)(7)(B)(iv) also supports plaintiffs' po-

11. We note in addition that the FCC "takes no position on whether provisions of the Telecommunications Act expressly preempt plaintiffs' suit." Similarly, in the trial court, the FCC assumed only *arguendo* that the statute does not expressly preempt plaintiffs' claims. The FCC's non-position on the express preemption issue could be read to imply that the agency does not find the Superior Court's interpretation of "personal wireless service facilities" untenable.

12. *See, e.g., Merlotto v. Town of Patterson Zoning Bd. of App.,* 43 A.D.3d 926, 841 N.Y.S.2d 650, 651 (N.Y.App.Div.2007) (zoning board reviewed "request for permission" to build second floor on house); *Mossburg v. Montgomery County,* 329 Md. 494, 620 A.2d 886, 892 (1993) (zoning agency required filing of "request for administrative authorization" before resident could "utiliz[e] a parcel of" land).

sition. For example, the Conference Committee Report to the Telecommunications Act explains that Congress's intent was to "preserve[ ] the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement" and that "[t]he limitations on the roles and powers of the Commission [described in section 332(c)(7)(A) ] *relate to local land use regulations* ...." S.Rep. No. 104–230 at 20708, 209 (1996) (Conf. Rep.) (emphasis added). Additionally, the relevant House Committee explained that it was including section 332(c)(7) in the bill it reported in order to address state and local policies related to "siting and zoning" and "planning and building." H.R.Rep. No. 104–204, pt. 1, at 94 (1995).

Given the surrounding language and the legislative history of section 332(c)(7)(B)(iv), we conclude that "personal wireless services facilities" refers to components of the nationwide wireless network that are fixed structures, not to cell phones. *See Farina v. Nokia*, 578 F.Supp.2d 740, 759 (E.D.Pa.2008) ("It seems unreasonable that a statutory section concerned with the parameters of local zoning authority could be read to affect state common law standards of care applying to an allegedly defective product."). Accordingly, we conclude that section 332(c)(7)(B)(iv) does not expressly preempt state law that would regulate cell phones.

**B.  Section 332(c)(3)(A)**

▆▆▆  Section 332(c)(3)(A) provides that:

> [N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commer-

cial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.

47 U.S.C. § 332(c)(3)(A). The Superior Court found that this section precludes plaintiffs' claims because "the use of potential jury verdicts based upon competing RF emissions standards would create a new hurdle for participating in the market." In our view, the Superior Court's conclusion cannot be reconciled with the second clause of section 332(c)(3)(A), which expressly permits states to restrict the "other terms and conditions of commercial mobile services" without regard to whether such terms and conditions may create hurdles or burdens attendant to participating in the market. We agree with the FCC's reasoning, in a 2000 order, that section 332(c)(3)(A)'s preemption clause could not encompass *all* tort suits that increase the "cost of doing business" because, if it did, this would render meaningless the "terms and conditions" language appearing in the same section. *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, ¶¶ 33, 34 (2000).[13] Other courts, too, have agreed with the FCC's reading of section 332(c)(3)(A) and, accordingly, have precluded states' direct efforts to prevent telecommunications companies from operating while upholding state regulation that merely imposes financial burdens on such companies. We agree with the *Farina* court that "Congress's intent in enacting [section 332(c)(3)(A) ] was to prevent the states from obstructing the creation of nationwide cellular service coverage, and not the preemption of health and safety and police powers." *Farina,*

---

**13.** The FCC's determination in this formal agency proceeding is entitled to deference. *See Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 96 (2d Cir.2000) (citing *Chevron USA, Inc.*

*v. Natural Res. Def. Council*, 467 U.S. 837, 843 n. 11, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (other citation omitted)).

578 F.Supp.2d at 761; *see also id.* at 758 ("nothing in the [statute] expressly preempts state common law designed to ensure the health and safety of cell phone users").

For the foregoing reasons, we conclude that plaintiffs' suits are not expressly preempted by 47 U.S.C. § 332(c).

## V.

■■■ We next address the issue of conflict preemption. Judge Long agreed with *amicus* FCC that the gist of plaintiffs' Complaints is that cell phones "that are sold in compliance with current FCC rules nevertheless may be deemed 'unreasonably dangerous' under state law, so that wireless carriers and equipment manufacturers potentially may be subject to civil liability on that basis." Judge Long concluded that the Complaints are barred by the doctrine of conflict preemption because, if successful, they would stand as an "obstacle" to the accomplishment of federal objectives. *See Geier,* 529 U.S. at 873, 120 S.Ct. 1913. She reasoned that, by urging a jury to find that defendants' cell phones emit unreasonably dangerous levels of RF radiation even though the phones' emissions are within the SAR guidelines adopted by the FCC, plaintiffs are effectively seeking to lower the FCC's current SAR standard. She concluded that the lawsuits would undermine the FCC's policy decision about where to set the SAR safety margin. In large part, we agree with Judge Long's analysis.

During the rulemaking process that the FCC opened in 1993 to consider adopting new guidelines for human exposure to RF radiation, the agency "considered carefully well over 150 sets of comments" and "consulted extensively with all of the relevant

health and safety agencies," ultimately adopting guidelines "based on the recommendations of these agencies." 12 F.C.C.R. at 13506, ¶ 34.[14] Among other comments, the agency considered comments from telecommunications-industry organizations that the industry would "not be able to function under the [suggested] approach ... that the Commission assume the worst in the face of any uncertainty" about radiation hazards. 12 F.C.C.R. at 13504, ¶ 28 (internal quotation marks omitted). With respect to study findings about the purported "non-thermal effects" of RF radiation in particular, the FCC considered, *inter alia,* comments that "billions of dollars are being invested in telecommunications infrastructure, and it is no simple matter to modify a telecommunications system as a result of each new study," *id.* at 1350405, ¶ 28, and that "the issue of non-thermal effects was explicitly addressed in the 1992 ANSI/IEEE standard, which concluded that no reliable scientific data exist to indicate such effects may be meaningfully related to human health." *Id.* at 13505, ¶ 28 (internal quotation marks omitted).

Ultimately, the FCC adopted a SAR standard based on the 1992 ANSI/IEEE recommendations (which were more restrictive than the 1982 ANSI recommendations) and on NRCP criteria, deciding against imposition of an even more stringent standard. Under the regulations that the FCC adopted, cell phones must be authorized by the FCC before they can be marketed or sold in the United States, *see* 47 C.F.R. §§ 2.801 and 2.803 (2008), and, as part of the equipment-authorization process, an applicant must certify that the equipment will not "cause human exposure

---

**14.** These included the Environmental Protection Agency, the Food and Drug Administration ("FDA"), the Occupational Safety and

Health Administration, and the National Institute for Occupational Safety and Health. *See Cellular Phone Taskforce,* 205 F.3d at 88.

to levels of radiofrequency radiation in excess of" the limits specified in the agency's regulations. 47 C.F.R. § 1.1307(b) (2008); 47 C.F.R. § 2.1093 (2008). The FCC emphasized in its rulemaking notice that the standards it adopted were "based on recommendations of expert organizations and federal agencies with responsibilities for health and safety[,]" since "[i]t would be impracticable for us to independently evaluate the significance of studies purporting to show biological effects, determine if such effects constitute a safety hazard, and then adopt stricter standards tha[n] those advocated by federal health and safety agencies." 12 F.C.C.R. at 13505, ¶ 31. The agency stated that this was "especially true for such controversial issues as non-thermal effects . . . ." *Id.*

Further—and most significant for our analysis here—the FCC explained its belief that the RF radiation limits it adopted "provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands." *Id.* at 13497, ¶ 5. The agency stated that

requiring exposure to be kept as low as reasonably achievable in the face of scientific uncertainty would be inconsistent with its mandate to "balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." [15]

*Cellular Phone Taskforce,* 205 F.3d at 92 (quoting 12 F.C.C.R. at 13496, ¶ 2).[16] Two United States Courts of Appeals have held that, because the FCC did not act in an arbitrary or capricious manner, the agency could properly reject stricter safety rules to achieve the balance that it judged to be appropriate. *See EMR Network v. FCC,* 391 F.3d 269, 273 (D.C.Cir.2004); *Cellular Phone Taskforce,* 205 F.3d at 92–93.

Given the FCC's contemporaneous explanations of the balance it sought to achieve by rejecting a more stringent safety standard, we conclude that state regulation that would alter the balance is federally preempted. In reaching this conclusion, we have given weight both to the FCC's "unique understanding of the statutes [it] administer[s] and [its] attendant ability to

**15.** The legislative history of the Telecommunications Act reveals that Congress contemplated that the FCC would engage in just such balancing. H.R. Rep. 104–204 describes the relevant House Committee's belief that

it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible. Such requirements *will ensure an appropriate balance in policy* and will speed deployment and the availability of competitive wireless telecommunications services which ultimately will provide consumers with lower costs as well as with a greater range and options for such services.

H.R. Rep. 104–204, pt. 1, at 94 (emphasis added).

**16.** *See also Cellular Phone Taskforce,* 205 F.3d at 90 (explaining that the FCC observed that "[i]n promulgating their standards, both the ANSI and the NCRP considered non-thermal effects"; that "ANSI found that no reliable scientific data exist indicating that nonthermal . . . exposure may be meaningfully related to human health and concluded that its exposure standard should be safe for all"; that NCRP "found that the existence of non-thermal effects is clouded by a host of conflicting reports and opinions"; and that "[a]ll of the expert agencies consulted were aware of the FCC's reliance on the ANSI and NCRP standards" and "had been advised of such evidence of non-thermal health effects as may have existed and still found the FCC's approach to be satisfactory") (internal quotation marks omitted).

make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Wyeth v. Levine*, —— U.S. ——, ——, 129 S.Ct. 1187, 1201, 173 L.Ed.2d 51 (2009) (quotation marks and citations omitted); and to the "agency's views about the impact of tort law on federal objectives," given that "the subject matter is technical and the relevant history and background are complex and extensive." *Id.* at 1202 (quoting *Geier*, 529 U.S. at 883, 120 S.Ct. 1913) (brackets and quotation marks omitted). We also find persuasive the FCC's argument in the *amicus* brief that verdicts

that would hold defendants liable for damages for bodily injuries caused by cell phones that met the FCC RF radiation limit "would necessarily upset [the] balance [the agency struck] and ... contravene the policy judgments of the FCC" regarding how safely and efficiently to promote wireless communication.[17]

The discussion above leads us to conclude that, insofar as plaintiffs' claims rest on allegations about the inadequacy of the FCC's RF radiation standard or about the safety of their FCC-certified cell phones, the claims are preempted under the doctrine of conflict preemption.[18] Such claims

**17.** *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (clarifying the distinction between the level of deference owed to formal agency regulations and informal agency interpretations in opinion letters and similar documents, which are not entitled to *Chevron* deference, but instead, are "entitled to respect ... *only to the extent they have the power to persuade*") (quotation marks and citation omitted; italics added); *see also Farina*, 578 F.Supp.2d at 764 n. 17 (finding that the FCC's *amicus* brief is "the equivalent of an opinion letter, not a formal regulation" and thus is "an informal determination entitled only to respect to the extent that it has the power to persuade").

In its recent decision in *Wyeth*, the Supreme Court clarified that courts are not to defer to an agency's "mere conclusion that state law is pre-empted" because "agencies have no special authority to pronounce on pre-emption absent delegation by Congress...." 129 S.Ct. at 1201 (italics omitted). Here, however, the FCC has done more than set out a mere conclusion about preemption; rather it has explained how the RF radiation limits that it adopted reflected a balancing of policy considerations and how plaintiffs' claims that would hold defendants liable for injuries from FCC-certified cell phones conflict with that balance.

**18.** *Cf. Altria Group, Inc. v. Good*, —— U.S. ——, ——, 129 S.Ct. 538, 544, 172 L.Ed.2d 398 (2008) ("Because Congress has decided that no additional warning statement is needed ..., States may not impede commerce in cigarettes by enforcing rules that are based on

an assumption that the federal warnings are inadequate."); *Riegel*, 128 S.Ct. at 1008 ("State tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme...."); *Crosby*, 530 U.S. at 374, 375, 377, 378, 120 S.Ct. 2288 (holding that state law that restricted the authority of state agencies to purchase goods or services from companies doing business with Burma undermined Congress's directive to the President to develop "a comprehensive, multilateral strategy towards Burma"; conflicted with the flexibility that Congress conferred on the President "to respond to change by suspending sanctions in the interest of national security"; obstructed Congress's "manifest[] inten[t] to limit economic pressure against the Burmese Government to a specific range" in that it "penalize[d]some private action that the federal Act ... may allow"; and disrupted Congress's deliberate effort to "steer a middle path") (citation omitted); *Geier*, 529 U.S. at 875, 881, 120 S.Ct. 1913 (holding that suit against automobile manufacturer for failure to install airbags was preempted where federal agency's "[airbag] standard deliberately provided the manufacturer with a range of choices among different passive restraint devices" and the tort suit "would have presented an obstacle to the variety and mix of devices that the federal regulation sought"); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (where train that struck and killed plaintiff's husband was traveling below maximum allowable operating

conflict with the FCC determination that "wireless phones that do comply with [the FCC's] RF standards are safe for use by the general public and may be sold in the United States." *See Bennett v. T–Mobile USA, Inc.*, 597 F.Supp.2d 1050, 1053 (C.D.Cal.2008) (holding that claims that cell phones are unsafe even though they comply with FCC standards "are a collateral attack on the FCC regulations themselves" and that "[a]llowing such claims would be to second-guess the balance reached by the FCC in setting RF emission standards under its delegated authority"); *see also* H.R.Rep. No. 104–204, pt. 1, at 95 ("A high quality national wireless telecommunications network cannot exist if each of its component[s] must meet different RF standards in each community.").[19]

■■■ We conclude that there is conflict preemption even as to plaintiffs' claims that seek damages on account of the non-thermal effects of cell-phone radiation.[20]

speeds for all freight and passenger trains as set by the Secretary of Transportation, suit against train operator was preempted insofar as claims of negligence were premised on allegations of excessive speed); *id.* at 674, 113 S.Ct. 1732 ("Understood in the context of the overall structure of the regulations, the [train] speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner."); *Herndon v. Nat'l R.R. Passenger Corp.*, 814 A.2d 934 (D.C. 2003) (negligence suit premised on charge that train was moving unreasonably fast under the circumstances was preempted where train was within federal speed limits).

19. We recognize that in its decision in *Pinney*, 402 F.3d at 430—a case in which plaintiffs sought to compel a cell-phone manufacturer to provide cell-phone headsets or other devices to minimize exposure to cell-phone RF radiation—the United States Court of Appeals for the Fourth Circuit concluded that suits similar to the instant ones were not barred on the basis of conflict preemption. For a number of reasons, we do not find the Fourth Circuit's conflict-preemption analysis persuasive. The primary reason is that the court appears to have reached its conclusion without considering the views of the FCC. *Id.* at 457 (considering only the fact that, in enacting 47 U.S.C. § 332, Congress neither addressed the "specific issue of the permissible amount of RF radiation from wireless telephones" nor indicated that its objective was "preemptive national RF radiation standards for wireless telephones"). Second, the court's focus was not on the adequacy of the FCC's SAR standard, but on whether states could require headsets, a focus revealed by the court's statement that "[i]t is difficult to understand how a headset requirement (the specific relief sought) would affect the establishment of a nationwide wireless service network or the availability of wireless service coverage." *Id.*

Third, the *Pinney* court gave weight to the fact that the FCC undertook its rulemaking relating to RF standards pursuant to the broadly applicable National Environmental Policy Act ("NEPA") rather than pursuant to specific radio-communications legislation. 47 U.S.C. § 332. 402 F.3d at 457. We do not believe that distinction is important, especially in light of the fact that the FCC adopted its current regulations *after* passage of the Telecommunications Act, which delegated to the FCC responsibility to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions," Telecommunications Act § 704(b), rulemaking that Congress directed "should contain adequate, appropriate and necessary levels of protection to the public." H.R.Rep. No. 104–204, pt. 1, at 95. Finally, we are not persuaded that the savings clauses on which the Fourth Circuit relied, *see* 402 F.3d at 458 (citing 47 U.S.C. § 414 and Telecommunications Act § 601(c)(1)), support the court's finding of no conflict preemption. The Supreme Court has "repeatedly declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." *Geier*, 529 U.S. at 869, 120 S.Ct. 1913 (citation and quotation marks omitted) (further noting that a "saving clause ... does not bar the ordinary working of conflict pre-emption principles") (italics omitted).

20. Plaintiff Michael Murray, for example, alleges that he "was exposed to non-ionizing non-heat effect radio frequency radiation ...

As to these effects, plaintiffs contend, the SAR standard "does not apply," leaving room for state regulation.[21] In some respects, the FCC's decision not to adopt a modified or separate standard specifically geared to the non-thermal effects of cell-phone RF radiation was similar to the agency action discussed in *Sprietsma v. Mercury Marine*, 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002), a case on which plaintiffs rely. Although the Coast Guard had "promulgated a host of detailed regulations" prescribing the use of specified equipment on recreational boats, *id.* at 60, 123 S.Ct. 518, it had determined that "[a]vailable propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats." *Id.* at 66, 123 S.Ct. 518. In light of the Coast Guard's explanation, the Supreme Court concluded that it was "quite wrong" to view the Coast Guard's decision not to adopt a regulation requiring propeller guards as "the functional equivalent of a

regulation prohibiting . . . States . . . from adopting such a regulation." *Id.* at 65, 123 S.Ct. 518; *see also id.* at 65, 67, 123 S.Ct. 518 (although "intentional" and "carefully considered," the Coast Guard's decision did "not convey an authoritative message of a federal policy against propeller guards"; rather, the decision was "fully consistent with an intent to preserve state regulatory authority pending the adoption of specific federal standards") (internal quotation marks omitted). Accordingly, the Supreme Court held, plaintiff's suit seeking damages from the manufacturer of an outboard motor for its failure to include a propeller guard as a safety device was not preempted. *Id.* at 67, 123 S.Ct. 518.

Like the Coast Guard in its adoption of the rules at issue in *Sprietsma*, the FCC did not "take the further step of deciding that, as a matter of policy, the States . . . should not impose" regulation directed at protecting against the non-thermal effects of RF radiation. *Sprietsma*, 537 U.S. at

---

which caused [his] adverse health effects and thereby caused the devastation that he and his family has [sic] had to bear." *See Cellular Phone Taskforce*, 205 F.3d at 90 (upholding the FCC's decision to forgo limits on non-thermal effects of RF radiation as "not arbitrary and capricious"); *EMR Network*, 391 F.3d at 273 (rejecting challenge to FCC's refusal to open a rulemaking procedure on this issue after consulting with expert advisors).

**21.** In some cases, a federal agency's decision not to regulate in an area renders state regulation permissible. *See, e.g., Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (holding that the agency's "refusal . . . to assert jurisdiction over rural power cooperatives" was not preemptive where agency "did not determine that, as a matter of policy, rural power cooperatives . . . should be left unregulated"); *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988) (It "cannot be" that "deliberate federal inaction could always imply pre-emption."). On the other hand, if the agency has determined that non-regulation advances the objectives of the

governing statute, additional state regulation will conflict with federal regulatory policy, and federal policy will trump state restrictions. *See, e.g., Ark. Elec.*, 461 U.S. at 384, 103 S.Ct. 1905 (explaining that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and [thus may] . . . have as much pre-emptive force as a decision to regulate") (citations omitted); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (state may not grant intellectual-property protections to an unpatented product; the non-existence of a patent reflects a federal determination that, in order to promote innovation, the product should remain "free for all to use"); *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 775, 776, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947) (National Labor Relations Board's determination that foremen's bargaining units "were not appropriate for bargaining purposes" preempted state labor board's protection of such units).

67, 123 S.Ct. 518. However, in our view, the matter at hand is different in a significant way from the situation in *Sprietsma*. As the Supreme Court observed, in enacting the Federal Boat Safety Act, Congress authorized the issuance of regulations prescribing minimum safety standards for recreational vessels, but did not *"require* the Coast Guard to promulgate comprehensive regulations covering every aspect of recreational boat safety and design; nor must the Coast Guard certify the acceptability of every recreational boat subject to its jurisdiction." *Sprietsma*, 537 U.S. at 69, 123 S.Ct. 518.[22] Here, by contrast, a critical fact is that Congress mandated that the FCC "shall ... prescribe and make effective rules regarding the environmen-

tal effects of radio frequency emissions," Telecommunications Act § 704(b), and Congress directed that the FCC's rules "should contain adequate, appropriate and necessary levels of protection to the public." H.R.Rep. No. 104–204, pt. 1, at 95. In addition, as already discussed, under FCC regulations, cell phones are subject to an FCC certification process.[23] We are satisfied that state regulation (such as the damages awards that plaintiffs seek) that would treat FCC-certified cell phones as defective and unreasonably dangerous-because of the non-thermal effects of RF radiation, even though the phones meet the FCC RF radiation standard—conflicts with federal law.[24] That is because, to

---

**22.** The fact of agency certification of equipment, or the lack of a certification scheme, has been a critical factor in other Supreme Court preemption cases as well. For example, in *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), at issue was a federal statute that directed the Secretary of Transportation to determine "which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States[,]" and, after inspection, to certify "each vessel as sufficiently safe to protect the marine environment...." *Id.* at 163, 165, 98 S.Ct. 988. The Court held that this regulatory scheme implicitly preempted the State of Washington from "exclud[ing] from Puget Sound vessels certified by the Secretary as having acceptable design characteristics" on the ground that they failed to satisfy the different and higher design requirements imposed by state law. *Id.* at 165, 98 S.ct. 988.

Also significant to the Court's decision in *Sprietsma* was the fact that the "Coast Guard has never taken the position that the litigation of state common-law claims relating to an area not yet subject to federal regulation would conflict with 'the accomplishment and execution of the full purposes and objectives of Congress.'" *Sprietsma*, 537 U.S. at 65–66, 123 S.ct. 518 (citation omitted). In this case, by contrast, the FCC argues as *amicus* that its refusal to regulate more specifically with respect to the non-thermal effects of RF radiation *was* intended to be preemptive.

**23.** *Cf. Farina*, 578 F.Supp.2d at 768 n. 19 (reasoning that the "nature and formality of the process and comprehensiveness of the federal regulatory scheme" distinguished the cell-phone case from cases in which a failure-to-warn suit was allowed where the federal agency had promulgated no pertinent standard, because the "FCC has done much more than merely decided not to require a warning; it has expressly evaluated the potential biological effects of FCC-licensed devices and adopted specific standards for RF exposure") (distinguishing *Fellner v. Tri–Union Seafoods, LLC*, 539 F.3d 237 (3d Cir.2008)).

**24.** The circumstances here also differ from those in *Wyeth*, —— U.S. ——, 129 S.Ct. 1187, 173 L.Ed.2d 51. The plaintiff in *Wyeth* claimed that the drug Phenergan is "not reasonably safe for intravenous administration," *id.* at 1192, and alleged that Wyeth, the drug manufacturer, failed to provide an adequate warning about the grave risk (of inadvertent intra-arterial injection and resultant gangrene) attendant to injecting the drug into a patient's veins. The drug's label stated that an IV-drip method of administration was preferable to intravenous injection, but did not "contain a specific warning about the risks" of the latter. The FDA had deemed the warnings on the drug's label to be adequate when it approved the company's new drug application. The issue before the Supreme Court was whether the FDA's approval provided Wyeth with a complete defense to the

prove their claims premised on allegations of injury from the non-thermal effects of RF radiation from FCC—certified cell phones, plaintiffs will necessarily

> [have] to ask a jury to accept [their] premise that the FCC's SAR maximum is inadequate to ensure the safe use of cell phones.... Thus, [they] seek[ ] to impose legal duties that would conflict directly with federal regulatory mandates because the Defendants could be held liable even though they indisputably complied with the SAR maximum.

*Farina,* 578 F.Supp.2d at 770.

Notwithstanding our conclusion that conflict preemption bars plaintiffs' claims for damages based on their allegations of bodily injury from FCC-certified cell phones, our analysis thus far does not permit us to uphold entirely the Superior Court's order dismissing plaintiffs' suits. This is so because we read the Complaints as alleging, in part, that plaintiffs' injuries were caused by cell phones that plaintiffs acquired *prior to August 1, 1996* (when the

FCC adopted its current regulation requiring SAR testing and certification for cell phones), and that (allegedly) did not comply with the current SAR standard.[25] Several statements in the Complaints and in plaintiffs' trial-court pleadings support this reading of the Complaints. First, plaintiffs' allegations are about cell phones "currently in widespread use"—*i.e.,* in use at the time plaintiffs filed their Complaints in late 2001 or early 2002—and most of the plaintiffs specify in their Complaints that they acquired their first cell phones prior to August 1, 1996. Plaintiff Murray alleges that he bought his first cell phone "[i]n or about 1993." Plaintiffs Schofield, Richard Schwamb, David Keller, and Balassare Agro similarly state that they bought their first cell phones prior to 1996, and Schwamb states that he used his "first and only cellphone" "from March 7, 1995 to the present" (presumably, February 26, 2002, the date when he filed his Complaint).[26] Further, the Complaints assert that "[i]n 1985, the FCC adopted the 1982 ANSI

---

plaintiff's tort claim. The Court held that it did not, and detailed several reasons for its conclusion.

One reason the Court cited was that FDA regulations permit a drug manufacturer "to change a product label to add or strengthen a warning about its product without prior FDA approval so long as it later submits the revised warning for review and approval." *Id.* at 1193 (citation omitted). Thus, the Court emphasized, under the FDA's regulations, manufacturers remain responsible for updating the labels for their particular drugs. *Id.* at 1196. Another fact the Court emphasized was that the FDA had paid no more than "passing attention" to the question of whether to warn against the dangers attendant to the intravenous method of administering Phenergan. *Id.* at 1199. Here, by contrast, all manufacturers are required to test and self-certify their cell phones for compliance with a uniform standard. And, during its rulemaking process, the FCC weighed competing views about whether the standard it adopted should be modified or supplemented to take into ac-

count non-thermal effects of RF radiation, 12 F.C.C.R. at 13505, ¶¶ 28, 31, and it gave extensive, rather than "passing attention" to the issue of whether it should require RF emissions to be "as low as reasonably achievable in the face of scientific uncertainty...." *Cellular Phone Taskforce,* 205 F.3d at 92.

**25.** Thus, we disagree with Judge Long's and defendants' readings of the Complaints. Judge Long found, for example, that plaintiffs' strict-product-liability claim "is not an allegation that any defendant manufactured a product that actually did not comply with the existing legal standard that allowed its manufacturer to sell to the public." Similarly, defendants assert that "it is undisputed that these cell phones [that plaintiffs used] were approved for use by the FCC, and were certified to meet the [federal] health and safety standards for RF emissions."

**26.** Schofield Compl. ¶ 24; Schwamb Compl. ¶¶ 21, 22; Keller Compl. ¶ 21; Agro Compl. ¶ 32.

standard *but excluded cell phones ...*" (emphasis added), and that early cell phones could not have met the 1982 ANSI standard (which is less restrictive than the 1992 ANSI/IEEE recommendation on which the FCC's current RF radiation standard is based). In their briefs to the Superior Court, plaintiffs asserted that defendants "introduced cell phones into the market without any prior oversight from any governmental agency...."[27] Plaintiffs' trial-court pleadings also assert that after enactment of the Telecommunications Act, the FCC "adopted guidelines for RF exposure from hand-held cell phones manufactured *after* the effective date of [the FCC's] 1996 order" (underscoring in original) and that "the 1996 standards set by the FCC only applied to SAR testing of new cell phones...."[28] All of these statements appear to focus on the facts—which plaintiffs assert and neither the FCC nor defendants have disputed in their briefs—that (1) prior to August 1, 1996, the federal government did not apply any RF exposure limit to cell phones; and (2) on and after August 1, 1996, cell phones manufactured prior to that date continued to be unregulated. This was also part of plaintiffs' focus during arguments before Judge Long on the motion to dismiss.[29]

Assuming that plaintiffs' claims entail in part a claim that they were injured through use of cell phones manufactured before August 1, 1996, that did not meet the standard that the FCC adopted as of that date (or through the use of any other non-FCC-compliant cell phones), we discern no reason why the claims should have been dismissed on the ground of conflict preemption.[30] Such claims—claims to which we refer more generally hereafter as "claims about non-FCC-compliant cell phones"—do not appear to challenge or to conflict with the FCC's RF standard for cell phones.[31] *Cf. Cipollone,* 505 U.S. at 524, 112 S.Ct. 2608 (holding, in light of the 1969 federal statute mandating a specific warning on cigarette packaging, that plaintiffs' failure-to-warn claims were preempted, but only insofar as they "require a showing that respondents' *post–1969* advertising or promotions should have included additional, or more clearly stated, warnings") (emphasis added). To determine whether such claims (if indeed plaintiffs raise them) are preempted, we must go on to analyze whether there is field preemption.

▮▮▮ The second reason why we must undertake further analysis is that the Complaints also assert claims under the CPPA. Although defendants characterize the CPPA claims as mere "derivative claims" that stand or fall with plaintiffs'

---

27. Plaintiffs' Mot. for Remand for Lack of Subject Matter Jurisdiction at 1.

28. *Id.* at 27, 41.

29. Plaintiffs' counsel lamented that "the people who bought the particular phone prior to [the FCC's adoption of the current SAR limit] now exceed [the limit], but they are not told that you are unsafe." Mot. Hrg. Tr. 27, Oct. 24, 2005.

30. We note that the FCC has not advised us of its position on whether such claims would be conflict-preempted. We express no opinion about whether the claims might be subject to

dismissal on another ground (such as on the basis of the statute of limitations).

31. We also note that, even if we were to construe 47 U.S.C. § 332(c)(7)(B)(iv) as expressly preempting plaintiffs' claims with respect to FCC-compliant cell phones, section 332(c)(7)(B)(iv) would not bar claims about injuries from cell phones that were not FCC-compliant, since it prohibits state "regulat[ion] ... of personal wireless services facilities on the basis of the environmental effects of radio frequency emissions" only "to the extent that such facilities comply with the Commission's regulations concerning such emissions."

other claims, we reject this sweeping characterization. The unlawful trade practices described in the CPPA, *see* D.C.Code § 28–3904, entitle an aggrieved person to sue for relief (under D.C.Code § 28–3905(k)(1)) "whether or not [plaintiffs were] . . . damaged thereby." D.C.Code § 28–3904. Under section 28–3905(k)(1)(A)(F), a successful CPPA plaintiff may recover statutory damages of $1,500 per violation (or, if greater, trebled actual damages) as well as punitive damages and other relief. Thus, in advancing CPPA claims, plaintiffs—who allege that they were "deceived"—do not necessarily seek to hold defendants liable solely for bodily injuries plaintiffs (allegedly) sustained from use of cell phones with allegedly dangerous RF radiation levels. Rather, defendants could be held liable for providing plaintiffs with false and misleading information about their cell phones, or for omitting to disclose material information about the phones, without plaintiffs having to prove that cell phones emit unreasonably dangerous levels of radiation.

Plaintiffs' CPPA Counts incorporate by reference all of the other paragraphs of the Complaints, so we are left to guess which allegations plaintiffs rely on in particular as the premise for their claims that defendants made false or misleading statements or omitted material information in connection with plaintiffs' cell phones. But we are satisfied that plaintiffs have pled at least several claims about false or misleading statements or omissions that, if proven, could be violations of the CPPA, and which do not necessarily depend for their success upon proof that cell phones are unreasonably dangerous.[32]

For example, the Complaints allege that defendants withheld information that while "[t]he 1992 ANSI guidelines required cell phones to operate below certain SAR limits," the cell phones that plaintiffs "had purchased had not been certified to be in compliance with the ANSI guidelines or the FCC mandated SAR limits." Similarly, in Count Nine, plaintiffs claim that defendants falsely represented that their goods have "approval" or "certification" that they did not have and misled plaintiffs "into believing representations regarding conformance with applicable product safety standards and/or statutes with full knowledge that the good and/or serv[ic]e *does not in fact conform*" (emphasis added). We see no reason why this claim should be preempted on the ground that it conflicts with the FCC regulatory standard (and, at oral argument, counsel for *amici* informed us that he was not author-

---

**32.** *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (To survive a motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face").

In *Twombly,* the Supreme Court admonished that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions" and that a "formulaic recitation of the elements of a cause of action will not do. . . ." *Id.* at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (for purposes of ruling on

a motion to dismiss, a court is not "bound to accept as true a legal conclusion couched as a factual allegation")). As we noted above, plaintiffs' CPPA Counts contain paragraphs that essentially are quotes from the CPPA and that fairly can be characterized as mere "formulaic recitations." However, as we also have observed, Count Nine incorporates by references the other paragraphs of the Complaints, and, as we go on to discuss, those paragraphs contain specific factual allegations about misrepresentations or omissions about cell phones that plaintiffs allege were material to their decisions about whether to purchase and use the devices.

ized to state a position on the issue of whether claims that cell phones violated the FCC standard would be preempted).

█ Another example of an allegation in the Complaints that could support plaintiffs' CPPA claims is plaintiffs' assertion that defendants have falsely represented that "[r]esearch has shown that there is absolutely no risk of harm associated with the use of cell phones." As based on this assertion, plaintiffs' false representation CPPA claim is not preempted on the ground that it conflicts with a specific federal policy, because, while the FCC has determined that cell phones that comply with the SAR standard are not unreasonably dangerous, even the federal government has acknowledged that "[t]here is no proof ... that wireless phones are absolutely safe." [33]

Additionally, the Complaints allege that the cell-phone "antenna is the most efficient means of depositing energy into the human body and penetrating human tissue" and that "the maximum Specific Absorption Rate exists at the antenna 'feed point.'" Plaintiffs allege that defendants "did not disclose ... that the cell phone antenna should be extended when the device is in use." [34] In another allegation of this type, plaintiffs allege that defendants failed to tell them that they could "use a headset or take other precautionary measures to reduce ... radiation exposure from cell phones...." To the extent that these claims are not read as claims that cell phones are unreasonably dangerous, but as claims that, in violation of the CPPA, defendants omitted information that was material to plaintiffs' decisions about whether to purchase or how to use a cell phone, the claims are not conflict-preempted.[35]

**33.** *See* "Cell Phone Facts–Consumer Information on Wireless Phones" (Appellants' Br. Ex. 11) at 8 (2003) (formerly available at http://www.fda.gov/cellphones).

Of course, to prevail on a CPPA claim, a plaintiff must show that a misrepresentation or omission was material. *See Ft. Lincoln Civic Ass'n v. Ft. Lincoln New Town Corp.,* 944 A.2d 1055, 1075 (D.C.2008) ("Under the CPPA the issue raised for the jury is whether appellees' statements ... and appellees' failure to disclose ... were actually material and tended to mislead") (citation omitted). Our analysis pertains only to whether plaintiffs' claims are federally preempted. We express no opinion as to whether plaintiffs' claims could meet the materiality standard. *See Herbin v. Hoeffel,* 806 A.2d 186, 197 (D.C.2002) ("At this preliminary stage of the proceeding, our job is not to evaluate whether appellant has proven his allegations, or whether we think he is likely to prevail...."). We also express no view about whether plaintiffs' CPPA are subject to dismissal on any other ground beyond federal preemption (such as on the basis of the three-year limitations period applicable to CPPA claims. *See Dist. Cablevision Ltd. P'shp v. Bassin,* 828 A.2d 714, 729 (D.C.2003)).

**34.** It is not clear whether plaintiffs are asserting that they were not informed that the an-

tennas on their (early-model) cell phones should be fully (rather than partially) extended, or whether they assert that defendants should have informed them that keeping antennas fully retracted increased the user's exposure to emissions. As defendants have advised us in a Rule 28(k) letter, if the latter, plaintiffs may have difficulty proving allegations that defendants omitted material information about antennas on FCC-certified cell phones because an FCC technical bulletin advises that manufacturers' tests must ensure that RF levels meet the SAR standard even if the cell-phone antenna is fully retracted. *See* FCC Office of Eng'g & Tech., Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields, Bulletin 65, Supp. C ("OET Bulletin") at 10, 40 (2001), http://www.fcc.gov/Bureaus/Engineering—Technology/Documents/bulletins/oet65/oet65c.pdf.

**35.** To be clear, we do not hold that any and all CPPA claims that the Complaints may be read to contain survive the preemption challenge. For example, a claim under the CPPA that defendants omitted telling plaintiffs that the FCC SAR standards are not adequate cannot be distinguished in any material way from a failure-to-warn claim (*i.e.,* a claim that defendants failed to warn defendants that FCC-

If plaintiffs' claims relating to (allegedly) non-FCC-compliant cell phones or all of their CPPA claims are preempted, this would have to be on the ground of field preemption rather than conflict preemption. We consider next whether the federal government has so occupied the field with respect to cellular telephones that the state regulation potentially involved here (*i.e.*, tort and statutory damages) is preempted.

## VI.

■ Defendants and *amici* argue, and the Superior Court found, that all of plaintiffs' claims are preempted because federal law so occupies the field of radio communication "as to make reasonable the infer-

ence that Congress left no room for the States to supplement" federal regulation. *Cipollone*, 505 U.S. at 516, 112 S.ct. 2608 (citations omitted). If federal law has fully occupied the field, preemption applies, even if there is no specific conflict between the federal law and state law. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212–13, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (citation omitted).[36]

We think that there can be no legitimate dispute that the federal government has long dominated the regulation of the technical aspects of radio communication, including those relating to cellular telephony.[37] Moreover, in passing the Telecom-

compliant cell phones are unreasonably dangerous), and would be preempted for the reasons we have already discussed.

36. Plaintiffs respond by invoking a "presumption against preemption," *Wyeth*, 129 S.Ct. at 1195 n. 3, arguing that we may not infer that Congress intended to supplant all state law in the field because such intent is not "clear and manifest." *See id.* at 1195 ("We start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (citation and internal quotation marks omitted). We need not resolve whether a presumption against preemption applies here because, for reasons we shall explain, even without such a presumption, we are not persuaded that the federal government has so occupied the relevant field that plaintiffs' claims relating to allegedly non-FCC compliant cell phones and their CPPA claims are barred under the doctrine of field preemption.

37. Believing that "regulation was essential" to realize the "potentialities of radio" (a "new and far-reaching science"), Congress passed the Radio Act in 1927 as a "comprehensive scheme of control over radio communication." *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 213, 214, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). The Radio Act required the Federal Radio Commission (predecessor to

the FCC) to regulate, among other things, "the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein." Radio Act of 1927, Pub.L. No. 69–632, 44 Stat. 1162 § 4(e) (1927). Congress expanded the regulatory scheme of the Radio Act through the Communications Act of 1934 ("the 1934 Act"), Pub.L. No. 73–416, 48 Stat. 1064 (1934), which created the FCC to administer a "unified and comprehensive regulatory system for the industry." *Nat'l Broad.*, 319 U.S. at 213, 63 S.ct. 997. Some thirty years later, the Supreme Court observed that federal regulation of certain "technical matters" of radio communication is "clearly exclusive." *Head v. N.M. Bd. of Exam'rs. in Optometry*, 374 U.S. 424, 430 n. 6, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963).

Pursuant to the 1934 Act, the FCC has been involved in overseeing cellular-telephone networks—a category of radio networks—since the inception of cellular technology. *See generally* Ilene K. Gotts & Alan D. Rutenberg, *Navigating the Global Information Superhighway: A Bumpy Road Lies Ahead*, 8 Harv. J.L. & Tech. 275, 291 (1995) (explaining that "FCC regulation of mobile radio service dates back to the very creation of the FCC"). During the late 1960s, the agency began efforts to develop and regulate a nation-wide cellular system, *see, e.g., Inquiry Relative to Future Use of Frequency Band 806–960 MHz, Second*

munications Act, Congress emphasized the importance of nationally uniform requirements affecting cellular telecommunications. H.R. Rep. 104–204 explains that, to facilitate the goal of building a "cellular telecommunications network[,] . . . it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible." H.R. Rep. 104–204, pt. 1, at 94. Further, observing that "local concern about the potential effects of radio frequency emission levels" is "at times not supported by scientific and medical evidence," *id.* at 95, Congress appeared to signal a preference for leaving the matter of RF emissions standards in the hands of federal agencies. In addition, early on, the FCC indicated its preemptive intent with respect to technical standards in cellular communication. In its 1981 order accompanying its first final rule on cellular communications, the FCC explained that "we are asserting federal primacy over the areas of technical standards and competitive market structure for cellular service" because doing so is necessary to further the "essential objective [of] . . . achiev[ing] nationwide compatibility." 86 F.C.C.2d at 50405, ¶ 79, 82. Subsequently, the FCC issued a statement "affirm[ing] our preemption over the technical standards for cellular systems[,]" explaining that this was "essential to the assurance of compatible operation of equipment on both local and national levels." *Inquiry into the Use of Bands 825–845 MHz and 870–890 MHz for Cellular Communications Systems*, 89 F.C.C.2d 58, 95, ¶ 81 (1982) (citation and internal quotation marks omitted). The agency further explained that it had

carefully developed the technical requirements essential for efficient spectrum re-use and nationwide compatibility, while providing sufficient flexibility to accommodate new technological innovations. It is imperative that no addi-

*Report and Order*, 46 F.C.C.2d 752 (1974) (describing the proposed cellular system and setting out guidelines for "authorizations for development of a cellular system"), eventually publishing a final rule governing the allocation of cellular-radio licenses in 1981. *See Cellular Communications Systems*, 86 F.C.C.2d 469, 470 (1981) ("We find that we now have a sufficient record to amend our Rules to provide for the authorization of cellular communication systems on a commercial basis.").

As to RF emissions specifically, the agency began inquiry into its "responsibility . . . to consider the biological effects of radiofrequency (RF) radiation" in 1979, requesting information but "not for the purpose of our promulgating radio frequency radiation health and safety standards" because "[t]hat is a function of the health and safety agencies". *Responsibility of FCC to Consider Biological Effects*, 72 F.C.C.2d 482, 494, ¶ 33 (1979). The agency eventually published a rule on RF exposure in 1985, a rule that applied only to "transmitting facilities that, in our judgement [sic], could have a significant environmental effect with regard to RF radia-

tion exposure." 100 F.C.C.2d at 559, 46. "Other types of transmitters [including "all transmitters with power outputs below ten watts"] would be categorically excluded" from the environmental assessment rules. *Id.* at ¶¶ 45, 46. As already discussed, while the FCC initially exercised authority to regulate the issue pursuant to the general mandate of NEPA, the agency later received specific direction from Congress, through the Telecommunications Act, to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions." Telecommunications Act § 704(b). Congress found that "[a] high quality national wireless telecommunications network cannot exist if each of its components must meet different RF standards in each community." H.R.Rep. No. 104–204, pt. 1, at 95. Accordingly, the agency promulgated its current regulations, which, *inter alia*, limit the RF emissions produced by cell phones authorized for sale in the United States. *See* 47 C.F.R. §§ 2.801, 2.803, 2.1093(a)(d). In short, the federal government has historically exerted a "significant . . . presence" in the technical areas of radio, including cell-phone communication.

tional requirements be imposed by the states which could conflict with our standards and frustrate the federal scheme for the provision of nationwide cellular service.

*Id.*

But there is also considerable evidence that, heretofore, the FCC has not intended to occupy *fully* the field of cellular-telephone-industry regulation. The FCC stated in its 1981 rulemaking order that it was "not exercising all of the authority we have to assert federal primacy[,]" explaining that states "can continue their complementary role regarding certification of carriers to provide mobile or cellular service." 86 F.C.C.2d at 505, ¶ 83. In 1985, the agency said that it did not "believe it is necessary at this time to resolve the issue of federal preemption of state and local RF radiation standards[,]" but advised that "[s]hould non-federal RF radiation standards be adopted, adversely affecting a licensee's ability to engage in Commission-authorized activities, the Commission will not hesitate to consider this matter at that time." 100 F.C.C.2d at 558, ¶ 43. By the time of its August 25, 1997, opinion and order, the FCC's view had evolved to a view "that there is insufficient evidence at this time to warrant our preempting state and local actions that are based on concerns over RF emissions for services other than those defined by Congress as 'personal wireless services.'" 12 F.C.C.R. at 13529, ¶ 88. At the same time, however, responding to a suggestion that the FCC "should specify a federal rule of liability for torts related to RF emissions," the agency stated that it "question[ed] whether such an action, which would preempt too broad a scope of

legal actions, would ... be appropriate." *Id.* at ¶ 90.

■■■ In light of the evolving nature and the somewhat mixed bag of statements by the FCC about the extent to which it intended to occupy the field relating to cell-phone RF emissions, we must agree with the conclusion that the Fourth Circuit reached in *Pinney* on the issue of field preemption: federal law "does not 'so thoroughly occupy [the] legislative field [of wireless telecommunications] as to make reasonable the inference that Congress left *no room* for the states to supplement it.'" 402 F.3d at 459 (emphasis added) (quoting *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608).[38]

■■■ The questions we must now address are whether plaintiffs' (possible) claims with respect to non-FCC-compliant cell phones and their CPPA claims fall within some *portion* of the field where the FCC left no room for state regulation. *Cf. Pac. Gas & Elec. Co.*, 461 U.S. at 213, 103 S.ct. 1713 (recognizing that the federal government may completely occupy "an identifiable portion" of a field). We believe the answer is "no" with respect to both types of claims.

## VII.

As already noted, in this proceeding, the FCC has not stated a position with respect to whether claims with respect to (allegedly) non-FCC-compliant cell phones are preempted. As to pre-August 1, 1996 cell phones, the regulatory history informs us that FCC policy was that pre-August 1, 1996, RF transmitting devices should com-

---

**38.** *See also City of Abilene v. FCC,* 164 F.3d 49, 53 (D.C.Cir.1999) (reasoning that "States may act to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommuni- cations services, safeguard the rights of consumers, manage the public rights-of-way, and require fair and reasonable compensation from telecommunications providers for use of public rights-of-way") (citation omitted).

ply with the RF standard that the FCC adopted as of that date, but that the agency did not require a recall or new testing of older devices or take other uniform action to ensure the safety of such devices (other than asserting its belief that "most existing devices already compl[ied]" with the new standard). *Guidelines for Evaluating Environmental Effects of Radiofrequency Radiation,* 11 F.C.C.R. 15123, 15168, ¶ 118 (1996). The agency stated that if it had "reason to believe that a previously authorized device may cause exposures in excess of the guidelines, we may request environmental information and require that the device be re-authorized based on compliance with the guidelines." *Id.* Because the FCC did not purport to assure that older devices met the RF radiation standards that the agency established after balancing various policy considerations, we are not persuaded that any claims plaintiffs wish to pursue premised on allegations that their early-model, non-FCC-certified cell phones were unreasonably dangerous, are preempted. We leave it to the parties and to the trial court to sort out whether plaintiffs do intend to pursue claims that their cell phones did not comply with the FCC SAR standard.

We reach a similar conclusion about plaintiffs' CPPA claims. The various FCC orders and guidelines that we have discussed throughout this opinion reveal that the FCC has left it as a matter of manufacturer discretion what information to provide to consumers about the use of their cell phones.[39] To our knowledge, the FCC also has not established a process for requiring manufacturers to submit consumer instructions for approval. Thus, we see no evidence that the federal government has purported to occupy entirely the field of consumer disclosures to cell-phone purchasers. The Supreme Court's analysis in *Wyeth* indicates that when the regulatory scheme leaves responsibility with manufacturers with respect to providing updated information to consumers and when the agency has given no more than "passing attention" to an issue, preemption should not apply to bar claims that the manufacturer failed to provide material information.[40] Finally, we do not discern— and appellees and *amici,* who have given short shrift to plaintiffs' CPPA claims, do not inform us—that to achieve an efficient and effective nationwide cell-phone-communications network, there needs to be uniformity with respect to such matters as what disclosures must be made to consum-

**39.** For example, in the notice of rulemaking in which it adopted the current RF radiation standard for cell phones, the FCC explained that

> [f]or purposes of evaluating compliance with localized SAR guidelines, portable devices shall be tested or evaluated based on 'standard' operating positions or conditions. In situations where higher exposure levels may result from unusual or inappropriate use of the device, *instructional material should be provided to the user to caution against such usage.*

11 F.C.C.R. at 15149, ¶ 69 (emphasis added). Similarly, in the FCC's OET Bulletin, issued to provide guidance to applicants for FCC equipment authorization, the FCC noted that cell-phone-antenna positions other than fully retracted or fully extended "can lead to excessive RF current flow on the chassis, maximum energy absorption in the cheek region may be expected." OET Bulletin at 10. The agency advised manufacturers that "[s]ince such conditions do not represent normal usage, *operating instructions and caution statements should be used to inform users to avoid operating with these antenna positions."* *Id.* (emphasis added). These statements neither mandate that manufacturers make disclosures to cell-phone users nor prescribe disclosure language.

**40.** *See Wyeth,* 129 S.Ct. at 1199; *id.* at 1203 n. 14 (A "tort case is unlikely to obstruct the regulatory process when the record shows that the [agency] has paid very little attention to the issues raised by the parties at trial.").

ers.[41]  Accordingly, we conclude that plaintiffs' CPPA claims are not preempted. Again, we leave it to the parties and the trial court to sort out the precise contours of the claims, and to the trial court to determine, as the occasion arises, whether the allegations of the Complaints sufficiently state claims under the CPPA.

## VIII.

For the foregoing reasons, we conclude that plaintiffs' claims that are premised upon allegations that defendants' FCC-certified cell phones are unreasonably "dangerous" because of RF radiation are barred under the doctrine of conflict preemption.  Plaintiffs' claims with respect to their pre–1996 cell phones (or other allegedly non-FCC-compliant cell phones), and at least some of their claims under the CPPA that defendants have made affirmative misrepresentations or material omissions with respect to plaintiffs' cell phones, are not preempted.  Accordingly, the judgment of the Superior Court dismissing the Complaints is

*Affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.*

41. *Cf. Head,* 374 U.S. at 430, 83 S.Ct. 1759 ("In areas of the law not inherently requiring national uniformity, our decisions are clear in requiring that state statutes, otherwise valid, must be upheld unless there is found such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field.") (citation omitted).