*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

### Nos. 17-TX-1296, 17-TX- 1297, 17-TX-1298, 17-TX-1299, 17-TX-1300, & 17-TX-1301

UNUM LIFE INSURANCE COMPANY OF AMERICA ET AL., APPELLANTS,

v.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CVT1-17, CVT2-17, CVT3-17, CVT4-17, CVT5-17, CVT6-17)

(Hon. Russell F. Canan, Trial Judge)

(Argued April 23, 2019                    Decided September 24, 2020)

*Carl Erdmann*, with whom *Chris Bowers* and *Nathan Wacker* were on the brief, for appellants.

*Loren L. AliKhan*, Solicitor General for the District of Columbia, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Stacy L. Anderson* and *Mary L. Wilson*, Assistant Attorneys General, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and KRAVITZ, *Associate*

*Judge, Superior Court of the District of Columbia.*[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

EASTERLY, *Associate Judge*:  As part of the comprehensive health care reforms enacted in the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 21, 25, 26, 29, 42 U.S.C.), Congress gave states a temporary financial incentive to take part in a new health insurance marketplace and establish health benefit exchanges where individuals and small businesses could more easily purchase plans meeting minimum federal requirements.  After the ACA's enactment, the District of Columbia Council established a health benefit exchange and authorized the entity overseeing the exchange to fund it through a tax on all health insurance companies doing a certain amount of business in the District.  *See* D.C. Code §§ 31-3171.01(6), 31-3171.03(f)(1) (2016 Repl.).  A group of insurers who are subject to the tax but do not offer health plans on the District's exchange, among them Unum Life Insurance Company, have challenged the tax, arguing that (1) the Council's legislation is preempted by the ACA, which does not permit the District to levy such a tax on these insurers, and (2) by allowing an executive agency to administer the tax, the Council impermissibly delegated its legislative power and violated the nondelegation doctrine as applied to the District's government.  The trial court rejected these arguments and granted the District summary judgment. We uphold the District's law against the insurers' challenge and affirm.

## I. Facts and Procedural History

Among other reforms, the ACA established American Health Benefit Exchanges ("Exchanges") to "facilitate[] the purchase" by individuals and small businesses of "qualified health plans" meeting certain statutory and regulatory qualifications as set out in the ACA. 42 U.S.C. § 18031(b) (2018); *see id.* §§ 18021, 18022(c) (defining qualified health plans). *See generally King v. Burwell*, 135 S. Ct. 2480, 2485–87 (2015) (summarizing ACA's reforms, including the role of the Exchanges). Congress gave states the option to establish and administer these Exchanges themselves, so long as the Exchange was a government agency or nonprofit and met other minimum requirements, such as maintaining an internet website through which individuals could enroll and a toll-free telephone hotline to field user requests. 42 U.S.C. §§ 18031(b), 18041(a)–(b). Exchanges were permitted to offer only qualified health plans, *see id.* § 18031(d)(2)(A), and could not sell certain types of insurance, *see id.* §§ 300gg-63, 300gg-91(c), 18032(d)(2)(B). For those states that declined to create their own Exchange, Congress directed the United States Department of Health and Human Services ("HHS") to operate an Exchange in those states. *Id.* § 18041(c). States that established Exchanges would receive federal financial and technical support, but only for the first few years after the ACA's enactment. *Id.* § 18031(a). The ACA provided that by January 1, 2015, the "State shall ensure that such Exchange

is self-sustaining . . . , including allowing the Exchange to charge assessments or user fees to participating health insurance issuers, or to otherwise generate funding, to support its operations." *Id.* § 18031(d)(5).

The District of Columbia opted to establish the District of Columbia Health Benefit Exchange ("Exchange") and created the District of Columbia Health Benefit Exchange Authority ("Authority") to oversee and implement it. *See* Health Benefit Exchange Authority Establishment Act of 2011 ("Establishment Act"), D.C. Law 19-94, 59 D.C. Reg. 213 (codified as amended at D.C. Code §§ 31-3171.01 to -3171.18). It also formed the District of Columbia Health Benefit Exchange Authority Fund ("Fund") and specified that any revenues placed into the Fund would be used to administer the Exchange. *See* D.C. Code § 31-3171.03(a). To fund the Exchange, the Council instructed the Authority to assess all health insurance carriers "doing business in the District" whose gross receipts met or surpassed $50,000 in one year, without regard to whether these insurers offer plans on the Exchange (referred to by the parties as the "health carrier tax"). *See* Health Benefit Exchange Authority Financial Sustainability Amendment Act of 2015, D.C. Law 21-13, 62 D.C. Reg. 5946 (codified at D.C. Code §§ 31-3171.01, 31-3171.03); D.C. Code § 31-3171.01(6). "These assessments shall be deposited in the Fund." D.C. Code § 31-3171.03(f)(1). The Council set the health carrier tax at

"an amount based on a percentage of [the insurer's] direct gross receipts for the preceding calendar year." D.C. Code § 31-3171.03(f)(1). It directed the Authority to "adjust the assessment rate in each assessable year" and required that the "amount assessed shall not exceed reasonable projections regarding the amount necessary to support the operations of the Authority." D.C. Code § 31-3171.03(f)(2)–(3).

The insurers pursuing this appeal all do business in the District, but they have never sold a plan on the Exchange, do not offer "qualified health plans" within the meaning of the ACA, and consequently may not offer their insurance plans for sale on the Exchange. *See* 42 U.S.C. § 18031(d)(2)(B)(i). Pursuant to the health carrier tax, they were assessed by the Authority approximately $400,000 in the aggregate in 2016. The insurers paid their assessments under protest, requested reconsideration by the Authority, and, when those requests were denied, filed a petition in the D.C. Superior Court in January 2017, challenging the legality of the health carrier tax.

The insurers filed suit in Superior Court because the federal courts foreclosed any challenge to D.C. Code § 31-3171.03(f) in that forum. In 2014, a trade association of insurance companies sued the Authority, the District, and

others in the United States District Court for the District of Columbia and raised various challenges to the statute, including that it was preempted by the ACA and violated nondelegation principles. *Am. Council of Life Insurers v. District of Columbia Health Benefit Exch. Auth.* ("*ACLI I*"), 73 F. Supp. 3d. 65, 73–74 (D.D.C. 2014), *vacated*, 815 F.3d 17 (D.C. Cir. 2016). The district court rejected all of the trade association's arguments and upheld the statute. *See id.* at 111. The United States Court of Appeals for the District of Columbia Circuit vacated this decision and remanded for the District Court to dismiss the suit on jurisdictional grounds. *Am. Council of Life Insurers v. District of Columbia Health Benefit Exch. Auth.* ("*ACLI II*"), 815 F.3d 17, 21 (D.C. Cir. 2016). The Circuit reasoned that D.C. Code § 31-3171.03(f) imposed a tax, and "exclusive jurisdiction over challenges to taxes imposed by the District" lay in the D.C. Superior Court. *Id.* at 19.

Relitigating many of the same issues that had been raised in federal district court, the insurers and the District filed cross-motions for summary judgment and proceeded on stipulated facts in Superior Court. Like the challenger in *ACLI I*, the insurers argued that the health carrier tax was preempted by the ACA and violated nondelegation principles. In ruling on the motions, the Superior Court adopted and

incorporated the *ACLI I* opinion and granted the District's motion for summary judgment and denied the insurers' motion. This appeal followed.

## II. Standard of Review

A trial court properly grants summary judgment where the record "show[s] that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Bruno v. W. Union Fin. Servs., Inc.*, 973 A.2d 713, 717 (D.C. 2009) (quoting Super. Ct. Civ. R. 56(c)). "In reviewing a trial court order granting a summary judgment motion, we conduct an independent review of the record, and our standard of review is the same as the trial court's standard in considering summary judgment." *Id.* (internal quotation marks omitted). Our de novo review extends to embedded constitutional claims, *Walton v. District of Columbia*, 670 A.2d 1346, 1352–53 (D.C. 1996), and matters of statutory interpretation, *Tippett v. Daly*, 10 A.3d 1123, 1126 (D.C. 2010) (en banc).

## III. Preemption

We are asked to determine whether a provision of the ACA, 42 U.S.C. § 18031(d)(5)(A), directing states to "ensure" that their Exchanges are "self-sustaining," preempts the District's health carrier tax under D.C. Code § 31-

3171.03(f)(1). "[P]ursuant to the Supremacy Clause, federal law may preempt state law, either expressly or impliedly." *Murray v. Motorola, Inc.*, 982 A.2d 764, 771 (D.C. 2009). Express preemption exists where the federal statute "reveals an explicit congressional intent to preempt state law," usually through a specific statutory provision. *Id.* (internal quotation marks omitted). Implied preemption occurs in one of two ways: (1) field preemption, "when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it," *id.* at 772 (internal quotation marks omitted); or (2) conflict preemption, "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 771 (internal quotation marks omitted).

The ACA contains no express preemption provision, and the insurers have not argued as much. The statute does contain, however, what could be called an express *non*preemption provision, which states "[n]othing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title."[1] 42 U.S.C. § 18041(d). At the very least this provision

---

[1] Because the statute contains an express nonpreemption provision, it seems unnecessary to rely on a common law presumption against preemption as the

(continued…)

bars a field preemption analysis. Conflict preemption is thus the only possible avenue of attacking D.C. Code § 31-3171.03(f)(1). The showing required for conflict preemption—that compliance with both laws is physically impossible or the state law, in effect, would obstruct the "accomplishment and execution" of Congress's goals, *Murray*, 982 A.2d at 771—appears to align with the language of § 18041(d) precluding preemption unless a state law "prevent[s the] application of" title 42 of the United States Code. In the absence of any argument by the parties that 42 U.S.C. § 18041(d) supplants or diverges from a traditional conflict preemption analysis, we examine whether the health carrier tax is preempted in accordance with those principles.

---

(…continued)
District invites us to do. In any event, this presumption—which favors the nonpreemptive interpretation of a statute where it is subject to multiple plausible interpretations, *see, e.g.*, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)—is not consistently discussed or applied by courts. The presumption appears to be most often invoked when federal law legislates in areas of "traditional state regulation." *Id.* Although states have traditionally regulated insurance, *see N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55 (1995), this does not describe the state-administered Exchanges, which are the product of a federal initiative. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.").

## A.    Plain Language

To conduct a conflict preemption analysis, we employ our usual tools of statutory interpretation and, as always, look first to the text of the federal statute. *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("[W]e begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs."); *Kennedy v. City First Bank of D.C., N.A.*, 88 A.3d 142, 144–45 (D.C. 2014); *see also Tippett*, 10 A.3d at 1126.

The relevant provision, 42 U.S.C. § 18031(d)(5)(A), provides:

> In establishing an Exchange under this section, the State shall ensure that such Exchange is self-sustaining beginning on January 1, 2015, including allowing the Exchange to charge assessments or user fees to participating health insurance issuers, or to otherwise generate funding, to support its operation.

Each party tells us that this text plainly supports its position, with the insurers arguing, on the one hand, that the statute requires that an Exchange itself be self-sustaining without assistance from other sources of state funding, and the District claiming, on the other, that it requires a state to maintain a self-sustaining

Exchange, without reliance on federal funding. We conclude that the plain text is ambiguous.

The insurers focus on language in the statute that "the Exchange" be "self-sustaining," which they interpret to mean that the Exchange "must produce funds from *its own operations only*." As a preliminary matter, we are unpersuaded by the insurers' argument that, by using the term "self-sustaining" in § 18031(d)(5), Congress clearly intended to "incorporate the well settled meaning" of the term in the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701 (2018). First, the IOAA, which applies to agencies of the United States government, 31 U.S.C. § 101, does not apply to the Authority, a state agency, D.C. Code § 31-3171.02(a); *see* 42 U.S.C. § 18031(d)(1). Relatedly, it is not helpful to the insurers that HHS invoked the IOAA when administering its Exchange pursuant to 42 U.S.C. § 18041(c). Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744, 13,746 (Mar. 11, 2014) (codified at 45 C.F.R. Parts 144, 147, 153, 155, 156 and 158); *see* 45 C.F.R. § 155.20. Since HHS is subject to the IOAA's requirements by virtue of its status as a United States agency, 42 U.S.C. § 3501, it must be "self-sustaining" pursuant to that statute, not by provision of the ACA, which is silent on whether the federal Exchange must be self-sustaining and separately imposes this requirement only on the state-run Exchanges. *Compare* 42

U.S.C. § 18041(c)(1), *with id.* § 18031(d)(5). Second, the ACA as a whole does not mention or incorporate the IOAA, and, in particular, does not refer to it in relation to the Exchanges. *Cf. Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). Third, the insurers have not articulated why we should read this term from the two statutes equivalently, as they neither relate to the same subject matter nor have the same purpose. *See Holt v. United States*, 565 A.2d 970, 975 (D.C. 1989). Fourth, the insurers have not put forward a persuasive argument for why "self-sustaining" is a "term of art" that incorporates IOAA case law. *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) (internal quotation marks omitted). The cases cited by the insurers purport to interpret the IOAA as a whole and do not emphasize that specific term, *e.g.*, *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340–41 (1974), undercutting the premise that, as used in that statute, "self-sustaining" is a distinctive legal term of art. Even if "self-sustaining" is a term of art in the IOAA context, the insurers fail to explain why the ACA would look to the IOAA to define "self-sustaining" instead of one of the seventy-six other instances where this term appears in the United States Code, *e.g.*, 15 U.S.C. §§ 1153, 8842 (2018) (Department of Commerce); 44 U.S.C. § 1903 (2018) (government printing); 45 U.S.C. § 745(a) (2018) (railroads). Fifth and finally, the reason federal courts have interpreted this language in the IOAA to prohibit federal agencies from levying taxes and to permit only the assessment of user fees—

concerns about constitutional separation of powers, *Nat'l Cable*, 415 U.S. at 340–41—is inapplicable here. The Exchange, an executive agency, did not impose the health carrier tax on the insurers; the D.C. Council, a legislative body, enacted it.

The IOAA aside, the insurers' plain-language argument has some force. Arguably, 42 U.S.C. § 18031(d)(5)(A) requires "Exchanges" to be "self-sustaining" in the sense that they must generate their own funding internally. As the insurers note, "the ordinary meaning of self-sustaining is 'able to maintain oneself or itself by independent effort.'" Yet we are mindful that "a word in a statute may or may not extend to the outer limits of its definitional possibilities." *Tippett*, 10 A.3d at 1127 (internal quotation marks omitted). Here, we hesitate to read "self-sustaining" in such a limiting manner, given that the statute expressly places an obligation on the State to "ensure" that the Exchange is self-sustaining. Particularly when read in conjunction with the subsequent language that permits the state to authorize an Exchange "to charge assessments or user fees to participating health insurance issuers[] *or* to otherwise generate funding[] to support its operation," this language suggests both that the state shoulders some responsibility for the solvency of the Exchange and that the state may authorize the Exchange to look beyond its own membership for funding.

The insurers also argue that § 18031(d)(5)(A) cannot be read to authorize taxes on nonparticipating issuers because doing so would render the only example of self-sufficiency in the statute—"to charge assessments or user fees to *participating* health insurance issuers"—superfluous. But their argument that Exchanges may impose only the kind of user fee described in the statute misreads an example as a sole prescription and ignores other expansive language that, as noted above, also "includ[es]," in specifying the means by which a state may "ensure" that an Exchange becomes self-sustaining, "allowing the Exchange . . . to otherwise generate funding[] to support its operations." *Id.* Relatedly, we reject the insurers' argument that this single example limits the interpretation of how Exchanges could "otherwise" become self-sustaining. It may be evident in other statutes that lists of examples have such a limiting effect, but it is not apparent that § 18031(d)(5)(A)'s one exemplar was meant to do so. *Cf. Begay v. United States*, 553 U.S. 137, 142 (2008) (explaining that the term "otherwise" placed in a statute after multiple examples "*can* (we do not say *must*) refer to a [thing] that is similar to the listed examples in some respects but different in others" (citation omitted)), *abrogated on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015).

For its part, the District argues that 42 U.S.C. § 18031(d)(5)(A) was enacted to ensure that the state Exchanges eventually operated without federal funding and

placed no constraints on the District's ability to raise funds for the Exchange. The District largely ignores the "self-sustaining" statutory language highlighted by the insurers and focuses instead on the "otherwise generate funding" language discussed above that is in tension with the insurers' interpretation. We cannot selectively read the text of the statute in either party's favor. *See Vining v. District of Columbia*, 198 A.3d 738, 750 (D.C. 2018) ("[E]ach provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." (internal quotation marks omitted)). And we take the insurers' point that if Congress had intended that result, it could have omitted the "including" clause specifying how an Exchange could generate funding, and simply enacted a statute that provided that "the State shall ensure that its Exchange is no longer dependent on federal funds after January 1, 2015."

We conclude that the plain language of § 18031(d)(5)(A) is not so clear and unambiguous as either party suggests. Accordingly, we turn to our other tools of statutory interpretation to discern Congress's intent.

## B. Other Tools of Statutory Interpretation

"The meaning . . . of certain words or phrases" in a statute "may only become evident when placed in context." *Tippett*, 10 A.3d at 1127 (internal

quotation marks omitted). Thus, when confronted with an ambiguous statutory provision, we turn to "the language of surrounding and related paragraphs" and the legislative scheme as a whole. *Id.* (internal quotation marks omitted); *accord Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (en banc) ("[A] statute is to be construed in the context of the entire legislative scheme." (citation and internal quotation marks omitted)).

The aim of 42 U.S.C. § 18031, entitled "Affordable choices of health benefit plans," is to encourage states to set up their own health benefit Exchanges meeting minimum requirements, within a specific timeframe, by removing start-up costs. Section 18031(a) allows HHS to give states initial funding to establish their Exchanges. Section 18031(b) obligates states to establish an Exchange by January 1, 2014, to be eligible to receive this funding. And § 18031(a)(4)(B) instructs HHS not to award funding to states after January 1, 2015. In this context, § 18031(d)(5)(A) is best read as a directive to states that, when federal funds expire, they must assume financial responsibility for the Exchange. We disagree with the insurers that, so understood, § 18031(d)(5)(A) is superfluous in light of § 18031(a)(4)(B); rather, each provision is directed toward a different entity.

The titles in subsection § 18031(d)(5)(A)—for the entire subsection, "Requirements"; for paragraph (5) "Funding Limitations"; and for subparagraph (A) "No Federal funds for continued operations"—reinforce the understanding that Congress's aim was to set out general structural requirements for Exchanges and one particular funding limitation:  a sunset date for federal funding.  *See Murray*, 982 A.2d at 773 (considering section titles in federal statute in determining that it did not expressly preempt common law claims).  At the same time, the flexibility and autonomy afforded to states in the provisions of § 18031 and the Subchapter in which it is located weigh against interpreting § 18031(d)(5)(A) as placing specific limits on state Exchanges' available revenue streams once they lose federal support.  When listing the "[r]equirements" for state-run Exchanges, 42 U.S.C. § 18031(d), Congress outlined general, "minimum" functions and did not impinge on states' prerogative either to provide additional services, *id.* § 18031(d)(4), or to impose additional benefit requirements on the qualified health plans offered on its Exchange, *id.* § 18031(d)(3).  While Congress set "[f]unding limitations" on state-run Exchanges, it explicitly proscribed only one funding source—federal funds after January 1, 2015—and only one funding use—"wasteful use of funds."  *Id.* § 18031(d)(5).  And Congress specifically highlighted its goal of granting states flexibility to operate their Exchanges in neighboring provisions governing Exchanges.  *See id.* §§ 18041–18044 (title of this Part, "State Flexibility Relating

to Exchanges"); *id.* § 18041 (title of this provision, "State Flexibility in Operation and Enforcement of Exchanges and Related Requirements"). Considered as a whole, this framework communicates that Congress intended to reduce barriers to the creation of state Exchanges and to specify only limited minimal requirements, permitting states to build Exchanges to suit their population and its needs. It follows that Congress would give states equal flexibility in determining how to fund their Exchanges.

This interpretation of § 18031(d)(5)(A) aligns with the federal regulations interpreting the same provision.[2] *Cf. Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1076 (D.C. 2008) (noting that "although the federal authorities are not binding on us, we may properly look to [federal] regulations and case law as persuasive authority in interpreting our own [analogous] statute" (internal quotation marks omitted)). HHS, as a general matter, foresaw minimal "Federalism implications," when setting standards for qualified health plans and requirements for Exchanges, because "States have choices regarding the structure and governance of their Exchanges" under the statute. Establishment of

---

[2] Federal regulations themselves may serve as a basis for preemption, *see Goudreau v. Standard Fed. Sav. & Loan Ass'n*, 511 A.2d 386, 389 (D.C. 1986), but the insurers have not made such an argument in this case.

Exchanges and Qualified Health Plans, 77 Fed. Reg. 18,310, 18,310–11, 18,443 (Mar. 27, 2012) (codified at 45 C.F.R. pts. 155–157). HHS's regulations require states to seek agency approval of their Exchanges, *see* 45 C.F.R. § 155.105, and to submit a funding plan to obtain approval, *see* Establishment of Exchanges, 77 Fed. Reg. at 18,322, but HHS emphasized that the ACA "provides flexibility for Exchanges to generate support for continued operation in a variety of ways, such as through user fees," *id.* at 18,323; *see also id.* (observing that "Exchange flexibility in funding ongoing operations is critical" and that "the Exchange has discretion to set parameters related to assessments").[3] Concerns very similar to those raised by the insurers here were brought to HHS's attention—including comments "ma[king] recommendations regarding the types of issuers that should be subject to any assessments established by the Exchange," with some specifically requesting a mandate that issuers offering "excepted benefit plans[] be excluded."

---

[3] The insurers argue, however, that when HHS subsequently commented that "Exchanges will be financially self-sustaining with revenue sources at the discretion of the State," Establishment of Exchanges, 77 Fed. Reg. at 18,443, HHS meant that "operating an exchange would be costless for states." We disagree. In context, the statement quoted by the insurers reflects HHS's judgment that the "flexibility" afforded to states by the ACA preserved substantial authority in the states in the administration of a complex federal regulatory regime, both because "States are not required to establish an approved Exchange" to begin with, and because the states that chose to administer their own Exchanges would have "discretion" to identify "revenue sources" for the Exchange. *Id.* (citing Exec. Order No. 13,132, § 6(b), 64 Fed. Reg. 43,255, 43,257–58 (Aug. 4, 1999)).

*Id.* Nonetheless, HHS declined to "limit Exchanges' options [in generating funding] by prescribing or prohibiting certain approaches." *Id.*

For all of these reasons, we conclude that § 18031(d)(5)(A) should be read as a directive to states to ensure that their Exchanges are self-sustaining after federal funding is discontinued, and not as a limitation on how states "generate funding" to support an Exchange's operations, much less a prohibition on seeking revenue beyond the one example given, "charg[ing] assessments or user fees to participating health insurance issuers." 42 U.S.C. § 18031(d)(5)(A). When § 18031(d)(5)(A) is read in this manner, there is no conflict between it and the District's health carrier tax. The tax does not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Murray*, 982 A.2d at 771. If anything, the tax, which raises necessary revenue to enable the operation of the Exchange without federal funding, furthers Congress's aim to expand the health care marketplace. *Cf. Bostic v. District of Columbia Hous. Auth.*, 162 A.3d 170, 174–75 (D.C. 2017) (holding that District law was not preempted by federal law where District law supported the purpose of the federal law). Notably, the insurers have not pointed us to any such case where a court rejected a funding mechanism similar to the District's health carrier tax as

preempted by the ACA. Accordingly, the insurers' conflict preemption argument fails.

## IV. Nondelegation

The insurers also argue that the District's health carrier tax, D.C. Code § 31-3171.03(f)(1), in which the Council empowers the Authority to assess all health carriers that do business in the District, violates the nondelegation doctrine. Specifically, they claim that the Council impermissibly delegated legislative power to the Authority by failing to articulate "intelligible principles" to guide the Authority in levying its health carrier tax. We disagree.

The nondelegation doctrine, as applied to the United States government, "is rooted in the principle of separation of powers that underlies our tripartite system of [g]overnment," and generally prevents one branch of government—executive, legislative, or judicial—from delegating its authority to another. *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989). Balanced against this principle is the recognition that, for government to run effectively, the distinct branches must coordinate. *Id.* at 372. Therefore, the legislative branch may delegate some of its power to another branch so long as it provides "an intelligible principle to which

the person or body authorized to exercise the delegated authority is directed to conform." *Id.* (internal quotation marks omitted).

Congress created the District's government in "the familiar tripartite structure," *Wilson v. Kelly*, 615 A.2d 229, 231 (D.C. 1992), and the District's legislature, the Council, "recognizes the principle of separation of powers in the structure of the District of Columbia government," D.C. Code § 1-301.44(b) (2012 Repl.). Though there is good reason to think the nondelegation doctrine applies to the District's government, we have never held that it does. *See Wilson*, 615 A.2d at 231 ("[I]t is reasonable to infer from this tripartite structure and the vesting of the respective 'power' in each branch that the same general principles should govern the exercise of such power in the District Charter as are applicable to the three branches of government at the federal level."). Since the District in its brief to this court "assumes the applicability" of the doctrine to our government, we too will assume for the purposes of our analysis that it applies to delegations by the Council to District agencies.

To articulate an intelligible principle to satisfy the nondelegation doctrine, the legislature must "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta*, 488

U.S. at 372–73 (internal quotation marks omitted).  In evaluating nondelegation, our analysis is not limited to the specific delegated authority; we consider the statutory scheme as a whole, including the purposes articulated by the legislature, limits placed on the delegation, and any guidance given to the agency.  *See Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 219–20 (1989); *Mistretta*, 488 U.S. at 374–77.

We conclude that the Council provided sufficient "intelligible principles" in D.C. Code § 31-3171.03(f)(1) to guide the Authority's discretion in levying assessments on health issuers to generate funds for the Exchange.  The Council identified the agency responsible for implementing its directive, the Authority, and the specific group of health carriers to be assessed.  D.C. Code § 31-3171.03(f)(1) (providing that the "Authority" shall assess those "health carrier[s] doing business in the District" only if their gross receipts from the preceding calendar year are "$50,000 or greater").  It permitted the Authority to determine at what percentage to set the assessment, *id*., but only to the extent that the total amount assessed "shall not exceed reasonable projections" of what is "necessary to support the [Exchange]," D.C. Code § 31-3171.03(f)(2).  *See Skinner*, 490 U.S. at 219 (affirming delegation by Congress to Secretary of Transportation to set user fees according to specific criteria where the fee schedule must "bear a reasonable

relationship to these criteria" (internal quotation marks omitted)). The Council mandated that the Authority deposit the assessments into the Fund, which it must administer "in accordance with generally accepted accounting principles," and that the Authority use the proceeds "solely for the purposes set forth in this chapter and the costs of administering this chapter." D.C. Code § 31-3171.03(a), (f)(2). The Council also prohibited the Authority from using any funds for promotional purposes, "[s]taff retreats," or "[e]xcessive executive compensation," D.C. Code § 31-3171.04(a)(22)(D), and it required the Authority to "keep an accurate accounting of all activities, receipts, and expenditures" and submit "a report of the accounting" to the Council each year. D.C. Code § 31-3171.04(a)(22)(A). Furthermore, the Council provided guidance to the Authority by explicitly defining its "duties and powers," D.C. Code § 31-3171.04, and listing its "purposes," D.C. Code § 31.3171.02(b). These provisions clarify that the Authority's mission is to facilitate individuals' and small employers' access to affordable and understandable health insurance and the ACA's programs, tax credits, and cost-sharing; improve the health insurance market place in the District; and "[r]educe the number of uninsured," among other goals. D.C. Code § 31.3171.02(b); *see Mistretta*, 488 U.S. at 374. "We have no doubt that these multiple restrictions . . . satisfy the constitutional requirements of the nondelegation doctrine." *Skinner*, 490 U.S. at 220.

## V.  Conclusion

Because we hold that the District's health carrier tax, D.C. Code § 31-3171.03(f)(1), is not preempted by a provision of the ACA, 42 U.S.C. § 18031(d)(5)(A), and does not violate nondelegation principles, the judgment of the Superior Court is affirmed.

*So ordered.*